RECEIVED
SEP 12 2017
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | |
|---|---|
| ELAND ENERGY INC. | CIVIL ACTION NO. 2:16-00368 |
| VERSUS | JUDGE JAMES T. TRIMBLE, JR. |
| MIDWEST RESOURCES, INC. ET AL | MAG. JUDGE KAY |

## MEMORANDUM RULING

Before the court is "Defendants' Motion for Summary Judgment" (R. #18) filed by Defendants, Midwest Resources 93-1 Oil & Gas Income Limited Partnership ("MW 93-1"), Midwest Resources 94-1 Oil & Gas Income Limited Partnership ("MW 94-1"), Midwest Resources 95-1 Oil & Gas Income Limited Partnership ("MW 95-1") and Midwest Resources 96-1 Oil & Gas Income Limited Partnership ("MW 96-1) (collectively referred to as "Midwest Partners") and Midwest Resources, Inc., wherein these defendants seek dismissal with prejudice of all of plaintiff's claims at plaintiff's costs.

## FACTUAL STATEMENT

Midwest Resources 93-1 Oil & Gas Income Limited Partnership, Midwest Resources 94-1 Oil & Gas Income Limited Partnership, Midwest Resources 95-1 Oil & Gas Income Limited Partnership and Midwest Resources 96-1 Oil & Gas Income Limited Partnership are limited partners and Midwest Resources, Inc.[1] is the general partner of a limited partnership (hereinafter, the Midwest Partners[2] and Midwest Resources, Inc. ("Midwest") will be referred to

---

[1] MW 96-1 subsequently acquired the 18.75% interest of Midwest Resources, Inc. Steve Baptie Affidavit, R. #18-3, ¶ 6.
[2] The Midwest Partners own a 50% undivided working interest in the Chalkley Leases and Eland owned the remaining interest. R. #18-3, ¶ ¶ 4-6; Plaintiff's exhibit A., ¶ 4.

1

as the "Midwest Entities"). Steve Baptie is the sole officer and President of Midwest and the sole authorized representative of the Midwest Entities.[3]

At various dates, the Midwest Partners were assigned an undivided interest in certain oil, gas and mineral leases and existing wells on properties located in the "Chalkley Field" in Cameron Parish, Louisiana (referred to as the "Chalkey Leases").[4] On November 30, 1995, MW 93-1, MW 94-1 and MW 95-1 entered into a Model Form Operating Agreement ("JOA") with Eland Energy Inc. ("Eland")[5] wherein Eland was appointed as the operator of the Chalkley Fields for a monthly overhead fee.[6] From 1995 until 2005, Eland oversaw and managed all operations relating to the wells and related facilities located on the Chalkley Leases;[7] the Midwest Entities did not conduct any operations on the property subject to the Chalkley Leases or on the wells located thereon.[8]

From 1995 until 2005, the Midwest Entities paid all monthly Joint Interest Billing Statements ("JIBs") for authorized costs and expenses incurred by Eland in connection with its operations.[9] In 2005, all wells located on the Chalkley Leases were plugged and abandoned by Eland due to no further commercial production; pursuant to the express terms of the Chalkley Lease agreement, the leases were terminated by their own terms.[10]

Eland informed the Midwest Entities by letter dated July 10, 2012 that it had been named as a defendant in a lawsuit styled as <u>Pine Pasture, Limited Liability Co., et al v. Shell Oil Company</u>[11]

---

[3] The original secretary of Midwest is now deceased. Defendants' exhibit A, Affidavit of Steve Baptie, ¶ ¶ 3, 5, 6.
[4] Defendants' exhibit A, Baptie Aff., ¶ 4 and attached exhibit A-1.
[5] Eland exhibit 1A, R. #1-1.
[6] Eland Exhibit 1B, p.2, ¶ 9, R. #1-2.
[7] Defendants' exhibit A, ¶ 9.
[8] Id.
[9] Id. ¶ ¶ 10, 11.
[10] Id. ¶ 12.
[11] Civ. Action no. 10-19047, 38th Judicial District Court, Cameron Parish, Louisiana ('State Court Suit").

and further informed the Midwest Entities that it had unilaterally hired the law firm of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L. P. ("Jones, Walker") and the law firm of Plauche, Smith & Nieset to defend the State Court Suit on behalf of Eland.[12] Eland never notified the Midwest Entities of any leaks spills, or other events or activities conducted by Eland that damaged or could have damaged the surface or subsurface of the lands burdened by the Chalkley Leases, nor has Eland provided any evidence confirming that its operations caused any damage to the land burdened by the leases.[13] Eland did not notify Steve Baptie of the State Court Suit until he received the July 10, 2012 letter.[14] Steve Baptie declares that, as the sole authorized representative of the Midwest Entities, he never delegated the defense of the State Court Suit to Eland.[15]

In July 2012, Eland began sending billing statements to the Midwest Entities which contained a one line item entry described as a "Legal Fees" expense.[16] Because of the amount billed, the Midwest Entities requested more detailed information,[17] but Eland refused to provide any further details regarding the charges unless the Midwest Entities signed a Joint Defense Agreement ("JDA") concerning the State Court Suit.[18] The Midwest Entities refused to sign the JDA.[19]

---

[12] Defendants' exhibit A, ¶ 14; Exhibit A-3.
[13] Id. ¶ 13.
[14] Id. ¶ 30.
[15] Id. ¶ 16.
[16] Id. ¶ 17; Exhibit A-4.
[17] Id. ¶ 19.
[18] Id. ¶ 19; Exhibits A-5 and A-6.
[19] Id. ¶ 20.

On February 20, 2014, counsel for the Midwest Entities, via a letter, expressly refused to pay the JIBs and informed Eland that the Midwest Entities had neither expressly nor tacitly delegated the defense of the state court lawsuit to Eland.[20] Eland's counsel made several demands and threats to file suit against the Midwest Entities to collect the legal fees. Mr. Baptie never authorized Eland to act on behalf of the Midwest Entities with respect to the Midwest Entities.[21] Because the Midwest Entities posited that they did not authorize Eland to retain outside counsel or incur any legal expenses on its behalf, the Midwest Entities refused to pay any of the legal fees.

On December 22, 2015, the Midwest Entities received a letter from the Jones, Walker law firm informing them that Eland had reached a settlement with plaintiffs in the State Court Suit.[22] Prior to the receipt of this letter, the Midwest Entities were unaware of any settlement negotiations or that Eland had entered a settlement agreement with plaintiffs in the State Court Suit.[23] By letter through their counsel, on February 1, 2016, the Midwest Entities objected to the settlement further stating that if Eland entered into the settlement, it would be doing so for its own account, but not for the account of the Midwest Entities.[24] Eland did not respond to the letter,[25] but proceeded to finalize and execute the settlement agreement on behalf of the Midwest Entities despite the objections and failure to provide the Midwest Entities with a copy

---

[20] R. #18-3, Exhibit A-7.
[21] Id. ¶ 21; Exhibit A-7.
[22] Id. ¶ 23; Exhibit A-8.
[23] Id. ¶ 23.
[24] Id. ¶ 24; Exhibit A-8.
[25] Id. ¶ 25.

4

of the settlement agreement.[26] Mr. Baptie did not authorize Eland to enter into the settlement agreement on behalf of the Midwest Entities.[27]

Eland filed the instant lawsuit against the Midwest Entities to collect fifty percent (50%) of the attorney fees it allegedly incurred in connection with Eland's defense of the State Court Suit as well as the settlement costs. Eland has provided no copies of invoices or other alleged costs to the Midwest Entities.[28]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, when viewed in the light most favorable to the non-moving party, indicate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[29] A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law."[30] A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[31] As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim."[32] Once the movant makes this showing, the burden shifts to the non-moving party to set forth specific facts showing that there

---

[26] Id. ¶ 25; Exhibit B.
[27] Id. ¶ 28.
[28] Id. ¶ 29.
[29] Fed. R. Civ. P. 56(c).
[30] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).
[31] Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999).
[32] Vera v. Tue, 73 F.3d 604, 607 (5th Cir. 1996).

is a genuine issue for trial.[33] The burden requires more than mere allegations or denials of the adverse party's pleadings. The non-moving party must demonstrate by way of affidavit or other admissible evidence that there are genuine issues of material fact or law.[34] There is no genuine issue of material fact if, viewing the evidence in the light more favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party.[35] If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.[36] The court will construe all evidence in the light most favorable to the nonmoving party, but will not infer the existence of evidence not presented.[37]

## LAW AND ANALYSIS

On November 31, 1995, the Midwest Partners and Eland entered into an Operating Agreement (the "JOA") which governs their rights and obligations in connection with their working interest ownership and operations in connection with the Chalkley Leases.[38] Eland relies on Article III(B) of the JOA to support its position that the Midwest Defendants owe them for half of the costs of the State Court lawsuit which provides in pertinent part the following:

> [A]ll costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of all jointly owned burdens which shall be borne as hereinafter set forth.

---

[33] Anderson, 477 U.S. at 249.
[34] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).
[35] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
[36] Anderson, 477 U.S. at 249-50.
[37] Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990).
[38] Plaintiff's exhibit A, ¶ 5; exhibit "A-1".

6

Article X of the JOA entitled "Claims and Lawsuits" provides in pertinent part as follows:

> Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed Twenty Five Thousand Dollars ($25,000.00) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

Section II. 10 of Exhibit C to the JOA provides as follows:

> Expenses of handling, investigating and settling litigation or claims, discharging of liens, payment of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, services of Operator's legal staff or fees or expense of outside attorneys and all other legal expense required for the benefit of the joint account are not considered to be covered by the overhead provisions of Section III and shall be billed to the joint account.

Article XIII of the JOA provides that "the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination."[39] Eland informs the court that it notified the Midwest Entities on July 10, 2012 of the pending lawsuit, which notice provided, in pertinent part, the following:

---

[39] Id. at Article XIII.

7

> Per the terms of the JOA, we are placing you on notice of the existence of these claims, informing you that for the benefit of the joint account Eland has engaged the below listed counsel [Jones Walker and Plauche' Smith & Nieset] to defend Eland against such claims, and informing you that Eland will be invoicing you under the JOA for your proportionate share of such defense costs and, if applicable, any judgment against Eland. Should any settlement discussions occur, we will comply with the terms of Article X of the JOA.[40]

The Midwest Entities did not respond to the notice, nor did they immediately contact Eland regarding the State Court Lawsuit.[41] Beginning in July 2012, Eland issued Joint Interest Billings ("JIBs") to the Midwest Defendants to reflect the legal fees in connection with the State Court Lawsuit.[42] On November 28, 2012, James DeJong, attorney for the Midwest Entities emailed Robin McGuire, Eland's General Counsel, stating as follows:

> We represent Midwest Resources, Inc., the general partner of the Midwest Resources 93-1, 94-1, and 95-1 Income Limited Partnerships. As a result of a JOA that Midwest Resources had entered into with Eland, our client has become involved in this litigation to the extent of paying its proportionate share of defense costs.[43]

Eland argues that this communication by the Midwest Entities effectively delegated the handling of the State Court lawsuit to Eland, as operator consistent with Article X of the JOA. In response to the Midwest Entities' December 14, 2012 request for invoices, Mr. McGuire sent Mr. DeJong a proposed agreement to preserve all privileges.[44] Other than acknowledging receipt of

---

[40] Plaintiff's exhibit A-2.
[41] Plaintiff's exhibit A, ¶ 9; Plaintiff's Exhibit B, Steven Baptie depo., p. 78, lns. 11-21.
[42] Plaintiff's exhibit A, ¶ 10. Plaintiff's Exhibit B, Baptie depo. p. 104, lines 16-23.
[43] Plaintiff's exhibit A-4.
[44] Plaintiff's exhibit A, ¶ 12; Plaintiff's Exhibit A-5.

8

the proposed agreement, the Midwest Entities did not respond nor agree to the proposed agreement.[45]

Long thereafter, on February 3, 2014, Mr. DeJong emailed Carl Rosenblum informing him that he would be meeting with Steve Baptie to review the Midwest Entities' obligations under the JOA, and that based on his experience, Midwest "kept its commitments."[46] As previously noted, on December 22, 2015, Eland provided notice to the Midwest Entities of a pending settlement in the State Court Lawsuit.[47] The pending settlement was subject to the State of Louisiana's approval through a letter of no objection. The State approved the settlement which was followed by the State court's approval and judgment on June 17, 2016.[48] Eland settled the lawsuit on behalf of itself, and purportedly, the Midwest Entities.[49]

Eland filed the instant suit to compel the Midwest Entities to fulfill their obligations under the JOA, i.e., to pay their proportionate ownership share (50%) of costs, expenses and attorneys' fees associated with Eland's defense and settlement of the State Court lawsuit.

Eland argues that the Midwest Entities are not entitled to summary judgment as a matter of law and additionally, there are genuine issues of material facts that are in dispute. Eland asserts that either the Midwest Entities delegated authority to Eland to handle the State Court lawsuit or the Midwest Entities are in breach of the JOA by failing to "assume and take over the further handling of the claim or suit." Eland maintains that if it is determined that the Midwest

---

[45] Plaintiff's exhibit A, ¶ 14; Plaintiff's exhibit A-6.
[46] Plaintiff's exhibit C-1.
[47] R. # 18-3, ¶ 23.
[48] Plaintiff's exhibits A-8 and A-9.
[49] Plaintiff's exhibit C, ¶ 6.

Entities did not delegate to Operator (Eland) the handling of the lawsuit, then the Midwest Entities breached Section X of the Operating Agreement because it failed to "assume and take over the further handling of the claim or suit." Thus, Eland posits that summary judgment in favor of the Midwest Entities is not warranted.

Midwest, on the other hand, asserts that Eland was never delegated authority to employ defense counsel and/or settle the claims asserted in the State Court suit on Midwest's behalf. Midwest maintains that Eland breached the terms of the JOA, specifically Article X thereof, by unilaterally, without Midwest's authorization or knowledge hiring defense counsel and negotiating a settlement of a suit in which it was not a named party.

Eland notes that the JOA expressly states that all costs, expenses and liabilities associated with suits related to the operations under the Agreement are to be at the joint expense of the parties participating in the operations. Article III(B) of the Agreement entitled "Interests of Parties" provides in pertinent part, that "...all costs and liabilities incurred in operations under this agreement shall be borne and paid . . . by the parties as their interests are set forth in Exhibit "A."[50] Article X of the Operating Agreement entitled "Claims and Lawsuits" provides that "[a]ll costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises."[51] Section II. 10. of Exhibit C to the Agreement provides that "[e]xpenses of handling, investigating and settling litigation or claims . . . shall be billed to the joint account."[52]

---

[50] Plaintiff's Exhibit "A-1", Article III(B).
[51] Id. Article X.
[52] Id., Section II. 10. of Exhibit C.

Eland cites <u>Alford v. Chevron U.S.A. Inc.</u>[53] wherein the court determined that all working interest owners in a lease are liable *in solido* in connection with operations conducted pursuant to the lease(s).[54] Eland submits that it would be absurd for the Midwest Entities to not have to do anything or be responsible for their share of the costs of the litigation based on the clear language of the JOA.

Eland challenges the Midwest Entities' arguments that the operations of the lease ceased, and the Agreement terminated, and thus cannot be relied upon as the legal or contractual basis for reimbursement. Eland relies on Article XIII of the Agreement which provides that "the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination."[55] As noted by Eland, the claims asserted in the State Court lawsuit arose from operations governed by the JOA and conducted pursuant to the Chalkley Leases. The court accepts Eland's position on this issue and rejects Midwest's argument that termination of the contract in 2005 would relieve Midwest of any obligation in the State Court lawsuit.

Eland challenges the Midwest Entities' statement that it is undisputed that "the Midwest Defendants did not delegate this authority to Eland."[56] Eland remarks that on July 10, 2012, it

---

[53] 13 F. Supp. 3d 581, 597 (E.D. La. 2014)("The obligations imposed upon mineral lessees by the Civil and Mineral Codes are indivisible.")
[54] See also <u>Sweet Lake Land & Oil Co. LLC v. Exxon Mobil Corp.</u>, 2011 WL 5825791 at *5 (W.D. La. Nov. 16, 2011); <u>Questar Exploration & Prod. Co. v. Woodward Villa, Inc.</u>, 123 So.3d 734, 738, n. 11 (La. App. 2 Cir. 8/7/13); <u>Matthews v. Goodrich Oil Co.</u> 471 So.2d 938, 944 (La.App. 2d Cir. 1985); <u>Nunley v. Shell Oil Co.</u>, 76 So.2d 111, 112-13 (La. App. 2 Cir. 1954).
[55] Plaintiff's exhibit A-1.
[56] The Midwest Entities relied on the affidavits of Steve Baptie and James DeJong.

sent written notice of the State Court lawsuit to the Midwest Entities which advised that Eland had retained counsel for the benefit of the joint account.[57] The letter further stated that:

> Per the terms of the JOA, we are placing you on notice of the existence of these claims, informing you that for the benefit of the joint account Eland has engaged the below listed counsel to defend Eland against such claims, and informing you that Eland will be invoicing you under the JOA for your proportionate share of such defense costs and, if applicable, any judgment against Eland. Should any settlement discussions occur, we will comply with the terms of Article X of the JOA.[58]

The Midwest Entities did not immediately respond or contact Eland.[59] As indicated in the July 2012 letter, Eland issued JIBs to the Midwest Entities which reflected legal fees in connection with the State Court lawsuit.[60] Eland remarks that for years, the Midwest Entities did not object to this "delegated authority." Eland relies heavily on a November 28, 2012 email authored by attorney James DeJong to Eland's General Counsel, stating as follows:

> We represent Midwest Resources, Inc., the general partner of the Midwest Resources 93-1, 94-1, and 95-1 Income Limited Partnerships. As a result of a JOA that Midwest Resources had entered into with Eland, our client has become involved in this litigation to the extent of paying its proportionate share of defense costs.[61]

Based on the Midwest Entities' failure to act and/or object to Eland obtaining counsel, defending the lawsuit and allocating the costs of defense to the JIBs, Eland maintains that the Midwest Entities delegated to Eland authority to handle and settle the State Court lawsuit. On

---

[57] Plaintiff's exhibit A-2.
[58] Id.
[59] Plaintiff's exhibit A, ¶ 9 Plaintiff's exhibit B, p. 78, lns. 14-20.
[60] Plaintiff's exhibit A, ¶ 10; Plaintiff's exhibit B, p. 104, lns. 16-23.
[61] Plaintiff's exhibit A-4. Mr. DeJong represented Midwest as its attorney.

12

February 20, 2014, the Midwest Entities notified Eland, through its counsel, that it was refusing to pay the JIBs[62] and expressly stated that it had not delegated authority to Eland to take over the handling of the claim or suit.[63]

Eland argues that the Midwest Entities' actions and inactions in light of their affirmative duty to otherwise "assume and take over the further handling of the claim or suit" is evidence that the Midwest Entities clearly delegated the authority to Eland to handle the State Court lawsuit.

This court heard oral arguments on August 23, 2017 to allow the parties to further expound upon their respective positions. The court is convinced based on the summary judgment evidence that it is undisputed that the Midwest Entities did not delegate authority to Eland as required by Article X of the JOA to represent the Midwest Entities' in the lawsuit. It is undisputed that Eland unilaterally retained counsel to defend the State Court lawsuit before it notified the Midwest Entities that suit had been filed against Eland. There is no dispute that Article X of the JOA requires prior authorization regarding claims in excess of $25,000. It is further undisputed that Eland settled the State Court lawsuit without the Midwest Entities' knowledge and/or consent; the terms of the settlement agreement were disclosed to the Midwest Entities after Eland signed it. It is also undisputed that on February 19, 2014, Midwest Entities' counsel, Joe Mize, made it crystal clear that there had been no delegation of authority in a letter sent to Eland's counsel wherein Mr. Mize stated "I have found nothing which would indicate that my

---

[62] Plaintiff's exhibit A , ¶ 15.
[63] Plaintiff's exhibit A, ¶ 20; Plaintiff's exhibit C, ¶ 6.

client, Midwest Resources, expressly or tacitly delegated the defense of the law suit . . . as is required by Article X of the Operating Agreement."[64]

Accordingly, we find that the Midwest Entities who expressly rejected such representation in writing on February 20, 2014 and again on February 1, 2016 cannot be held liable for a settlement agreement which Eland had no authority to enter into on behalf of the Midwest Entities; nor can the Midwest Entities be held accountable for attorney fees that it never authorized. The court is cognizant of the language in the JOA that obligated the Midwest Entities to be responsible for its proportionate costs and expenses, however, the JOA first required Eland to obtain delegated authority from the Midwest Entities.

The operative and undisputed facts relevant to this case are summarized as follows:

1. A petition was filed in state court in Louisiana on June 4, 2012, which named Eland as one among other defendants allegedly liable to plaintiff for damages to plaintiff's property resulting from Eland's drilling operations conducted pursuant to a JOA between Eland and defendants in this lawsuit. The petition identified Eland's agent for service of process and the agent's address in Baton Rouge, Louisiana.

2. Article X of the JOA required <u>all</u> parties (Eland and the Midwest Entities) to assume the handling of such a suit unless "operator" (Eland) was delegated authority to act on Midwest's behalf.

3. Without notifying Midwest of the suit, Eland took it upon itself to hire two law firms to defend the claims. Not until July 10, 2012, did Eland notify Midwest by letter that it had

---

[64] R. #29, Exhibit A-7, p. 3.

been sued, had retained counsel, and "will be invoicing you under the JOA for your proportionate of such defense costs, and if applied, any judgment against Eland." Midwest was not named a party in the state suit. It was never afforded an opportunity to participate in the selection of defense counsel.

4. Beginning in July 2012, Eland began to send Midwest monthly billing statements including a one line item for "Legal Fees," with no further explanation. Because of the amounts, Midwest requested further information. The JOA required Eland to identify the authority for each expenditure and "unusual charges" were to be "separately described in detail." (Doc. 1-2, p. 6). No one disputes that the legal fees, totaling over one million dollars, were unusual charges. Eland refused to provide any detailed information about the "legal fees" unless Midwest agreed to sign a Joint Defense Agreement, which Midwest refused to do. The JOA does not require such an agreement as a pre-condition to receiving the full explanation for unusual charges.

5. On November 28, 2012, Midwest's counsel emailed Eland's general counsel stating, inter alia, "Our client has become involved in this litigation to the extent of paying its proportionate share of defense costs." The letter also incorrectly stated that Midwest had paid some of the bills for legal fees sent by Eland. The parties agree that Midwest has not to this date paid one cent of Eland's legal fees.

On February 19, 2014, Midwest's attorney wrote Eland's lawyer to advise that he found no express or tacit delegation of authority for Eland to take over and defend the state suit at Midwest's expense. He pointed out that the proposed joint defense agreement sent

from Eland to Midwest on December 12, 2012, provided that the parties would have separate counsel to defend the state court suit.

6. Eland's July 10, 2012 letter also committed Eland to "comply with the terms of Article X of the JOA" if any settlement discussions should occur. That commitment notwithstanding, the next word from Eland concerning settlement was a letter received by Midwest, dated December 22, 2015, from Eland's lawyer. The letter advised that Eland had agreed upon a settlement in the state court suit, subject to approval by the State of Louisiana. Midwest's attorney, by letter dated February 1, 2016, objected to the settlement and made it clear that any settlement would be for Eland's, not Midwest's account. The state approved the settlement in June of 2016. Eland, in the instant suit, seeks judgment against Midwest for fifty percent of defense and settlement costs.

Based upon the foregoing and the terms of the JOA, this court finds the conduct of Eland to be the apogee of arrogance. In clear contravention of Article X of the JOA, Eland, with no notice to or consultation with Midwest, hired two firms of attorneys to defend the state suit. Suit was filed on June 4, 2012 and the service agent for Eland was in Baton Rouge, Louisiana where service should be easily effected within three days at most. The state court suit is a so-called "legacy lawsuit," which notoriously involves far in excess of $25,000.00.

Upon receipt of the suit papers in early June, Eland had ample time to confer with Midwest, jointly agree on defense counsel and payment of same, and discuss the merits of the state suit. Midwest had conducted no operations whatsoever on the property and would therefore have committed no act or omission causing damage to or contamination of the land. Midwest, from

16

start (1995) to termination (2005) of operations pursuant to the JOA, had promptly paid all of Eland's JIBS. Common courtesy, as well as the terms of the contract, demanded that Eland invite Midwest's participation from the date Eland was served with suit papers if Eland expected Midwest's fifty percent contribution to defense and settlement of the state litigation.

The thread of evidence upon which Eland's case hangs is the language of Mr. DeJong's November 28, 2012 letter. It is undisputed that DeJong was laboring under the mistaken belief that prior billings for legal fees had been paid by Midwest. They had not, as Eland knew full well. In fact, these bills had accrued for some five months before DeJong's letter.

The language of the letter does not acknowledge Midwest's liability for past or future defense costs, much less delegate authority for Eland to bind it to the terms of a settlement of the suit. It simply says that "our client has become involved in this litigation to the extent of paying its proportionate share of defense costs." Indeed, at the time the letter was written, that is all of Midwest's involvement in the litigation. That is all that had been demanded of it. Bills had been sent but remained unpaid, while Midwest's requests for details of the large legal fees went unheeded. The quoted language, coupled with the unpaid and disputed bills for legal fees, cannot reasonably be integrated to delegate authority for Eland to defend and settle the state suit at Midwest's expense. As defense counsel points out, if Eland truly believed that it had authority to act for Midwest at Midwest's expense, why would it have deemed a JOA as proffered in Eland's letter dated December 12, 2012, necessary, after it had received the November 28, 2012 letter from DeJong?

From the evidence presented, this court is convinced that plaintiff, Eland, breached the clear terms of the JOA upon which it relies for recovery herein and acted without authority in employing defense counsel and settling the state suit purportedly on behalf of and for the benefit of Midwest. Eland chose to take the bit in its mouth and run with it (a poor metaphor, since an African antelope is not known to engage in the "Sport of Kings") without inviting Midwest to the race and is therefore destined to cross the finish line riderless.

## CONCLUSION

Based on the foregoing, the motion for summary judgment will be granted and the lawsuit dismissed.

**THUS DONE AND SIGNED** in Alexandria, Louisiana on this 12th day of September, 2017.

_____
JAMES T. TRIMBLE, JR.
**UNITED STATES DISTRICT JUDGE**